UNITED STATES of America, Appellee,

v.

Max SCHAFFER, Norman Schaffer, Benjamin T. Marco and Hyman Karp, Defendants-Appellants,

Anthony Stracuzza, Mario Stracuzza and Dorothy Stracuzza, Defendants.

No. 160, Docket 25328.

United States Court of Appeals Second Circuit.

Argued Dec. 4, 1958.

Decided April 21, 1959.

436

John T. Moran, Jr., Asst. U. S. Atty., New York City (Arthur H. Christy, U. S. Atty., and George I. Gordon, Asst.

U. S. Atty., New York City, N. Y., on the brief), for appellee.

Jacob Kossman, Philadelphia, Pa. (Irving W. Coleman, Northampton, Pa., on the brief), for Max Schaffer and Norman Schaffer, defendants-appellants.

Harris B. Steinberg, New York City, for Hyman Karp and Benjamin T. Marco, defendants-appellants.

Before SWAN, MEDINA and WATERMAN, Circuit Judges.

MEDINA, Circuit Judge:

Defendants-appellants Max Schaffer, Norman Schaffer, Benjamin T. Marco, and Hyman Karp were convicted of violating Section 2314 of title 18 United States Code by knowingly transporting stolen merchandise consisting of ladies' and children's wearing apparel of a value in excess of $5,000 in interstate commerce.[1] Appellants were tried together to a jury on two indictments, only the first of which is relevant here. The second indictment, containing a single count charge of conspiracy to violate 18 U.S.C. § 659, by receiving and concealing goods stolen in interstate commerce, of a value of more than $100, knowing the same to have been stolen was dismissed at the close of the prosecution's case.

The first indictment is in four counts. Count one charges defendants Max and Norman Schaffer and three other defendants, Anthony (Tony) Stracuzza, Mario Stracuzza and Dorothy Stracuzza, with knowingly transporting stolen merchandise between the Southern District of New York and Lebanon, Pennsylvania, during the period from May 15, 1953 to and including July 27, 1953. Count two charges a similar violation by the Stracuzzas and Marco, the transportation taking place between the Southern District of New York and Bluefield, West Virginia, during the period from June 11, 1953 to and including July 27, 1953.

Count three charges a similar offense by the Stracuzzas and Karp, the transportation occurring between the Southern District of New York and Fall River, Massachusetts, during the period from May 21, 1953 to and including July 27, 1953. The fourth count charges the four appellants and the three Stracuzzas with a conspiracy to transport stolen merchandise in interstate commerce during the period from September 1, 1952 to October 20, 1954.

Tony and Mario Stracuzza pleaded guilty prior to trial and the indictment of Dorothy Stracuzza was severed and pending at the time of the trial. At the conclusion of the prosecution's case, which took a little over two weeks to present, each of the appellants rested without calling any witnesses in his behalf. The Court, on motions made by the appellants, dismissed the conspiracy count. The substantive counts went to the jury, the principal issue being whether or not each defendant knew that the goods he received from the Stracuzzas was stolen. Each defendant was found guilty of the substantive charge made against him. The two Schaffers and Karp were each sentenced to two years imprisonment, and each was fined $10,000. Marco received a sentence of four years imprisonment and a fine of $10,000. All appellants were released on bail pending appeal.

The Government proved that each appellant, a retail garment store owner, entered into a standing agreement with Tony Stracuzza by which merchandise was shipped to him at substantial discounts, previously agreed upon. This merchandise was stolen by Mario Stracuzza, Tony's brother and assistant, who induced various truck drivers to turn the goods over to him for a share of the profits. Such practices had been going on for several years and this illegal business had been initially operated by Sol

---

1. 18 U.S.C. § 2314 provides:

"Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud * * *

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both. * * *"

Eisenberg and Hymie Berk. At first acting in a subordinate capacity with Eisenberg and Berk, Tony along with his brother Mario later formed a partnership with Berk in September 1952 and did business under the name A. Finkel. This partnership lasted until March 1953. Each of the appellants did business with Berk and Eisenberg and all but Marco did business with A. Finkel.

In May 1953 Tony and Mario set out on their own and began operations under the name A. Schafler. It is the appellants' dealings with this concern that are the basis of the indictment. Goods were sent to each appellant at rates 55–65% of the original manufacturer's price. According to agreement Tony Stracuzza sent each appellant the original manufacturers' invoices with each shipment. Max and Norman Schaffer visited each of Stracuzza's various establishments on several occasions and they saw both the merchandise and the manufacturers' invoices. Karp also visited all establishments but A. Schafler's and Marco dealt personally with Stracuzza at Berk and Eisenberg's and at A. Schafler's. The wealth of other evidence produced on trial need not be detailed at this point but will be alluded to as it becomes relevant.

Appellants make the following points: (1) that it was error to refuse to dismiss the indictment and to direct a verdict of acquittal in favor of each appellant on the ground that the aggregation of the value of various shipments was permitted despite the fact that no single shipment to any appellant was of a value of $5,000; [2] (2) that it was error to submit any of the substantive charges to the jury in view of the dismissal of the conspiracy count, due to the prejudicial effect on each appellant of the evidence admitted in support of the conspiracy count and the evidence received against each of the other appellants in support of the substantive charges; and (3) that it was error to refuse to direct a mistrial because of allegedly prejudicial and improper comments made by the prosecutor in his summation to the jury.

We shall discuss these contentions *seriatim,* but find no merit in any of them.

### The Propriety of Aggregating Shipments

It is conceded that no shipment to any appellant was worth as much as $5,000. On the other hand, it is agreed that if shipments may be aggregated, the statutory requisite is far exceeded.[3] The judicial authority on this point is rather meager and we think with good reason.[4] For the answer has been spelled out in no uncertain terms in the statute and in the legislative history.

Section 2311 of title 18 U.S.C. furnishes the basic definitions used in the chapter on stolen property which includes sections 2311 through 2317. It is there provided:

" 'Value' means the face, par, or market value, whichever is the greatest, and the aggregate value of all goods, wares, and merchandise, securities, and money referred to in a single indictment shall constitute the value thereof."

That the statute means precisely what it says is shown by the following excerpts from the relevant Congressional reports:

H.R.Rep. 1462, 73d Cong., 2d sess., p. 2 (1934)—

"As reported by your committee, the jurisdiction of the Federal Government is limited to cases in which the value of the stolen property is

---

2. Appellants Karp and Marco also claim that it was error with respect to them to submit the substantive charges against them to the jury because of the alleged absence of proof that the merchandise sold to them was stolen.

3. The evidence indicates that the goods purchased and transported by the Schaffers were worth wholesale $19,531.52; by Karp, $17,175.24; by Marco, $23,080.-14.

4. See Andrews v. United States, 4 Cir., 1939, 108 F.2d 511; cf. United States v. Segelman, D.C.W.D.Pa., 1949, 86 F. Supp. 114.

$5,000 or more, except in cases of pledging or accepting in pledge such property for a loan in which case the minimum is set at $500. *There is added a provision which authorizes Federal jurisdiction in the case of a series of transactions* involving property of a total value of $5,000 or more." (Emphasis added.)

The reason for the $5,000 limitation is given in this same report. It continues:

"It is believed that it would place too great a burden on the Department of Justice to ask it to undertake to apprehend and prosecute every person violating the substantive provisions of such a law without regard to the amount of property involved. The minimum valuations fixed in the bill required to give the Federal Government jurisdiction are the figures asked and recommended by the Attorney General."

H.R.Rep. 1599 (Conference Report), 73d Cong., 2d sess., p. 3 (1934) contains the following:

"The second amendment of the House added, also, a provision which authorizes Federal jurisdiction in the case of a series of transactions involving property of a total value of $5,000 or more. The Senate agreed to the amendment."

H.R.Rep. 422, 76th Cong., 1st sess., pp. 1–2 (1939)—(in amending the Stolen Property Law) reads:

"It is to be noted, in this connection, that under the terms of section 5 of the Act in the event the defendant is charged with a series of violations, the aggregate value of the property referred to in the indictment may be taken to make up the minimum valuation."

As the "series of transactions" between the Stracuzzas and each appellant related to stolen merchandise of "the aggregate value" of more than $5,000, the case clearly meets the statutory test.

Appellants appear to contend that each of the shipments was separate and distinct from the others as they cite An-drews v. United States, 4 Cir., 1939, 108 F.2d 511, a case where transactions involving values less than $5,000 were aggregated, as the conspiracy established in that case "gave them unity for the purpose of the statute." By way of dictum (at page 514) it was said that "transactions which are entirely separate and distinct cannot be grouped for the purpose of establishing a value within the statute." We need not now decide what ruling should be made in a case where the transactions are truly "separate and distinct." Much may depend upon the facts of a particular case. Here, however, it is perfectly clear that the shipments with respect to each appellant were not "separate and distinct." Although the overall conspiracy between the Stracuzzas and the four appellants was not established, the proofs disclose as to each appellant a sufficient "unity for the purpose of the statute." All goods acquired by each appellant were acquired from the same distributor, Tony Stracuzza; all goods were acquired at the same discount according to a prearranged agreement; all shipments included within the indictment as to each appellant were concentrated within a specified time of no more than two and one-half months; each shipment had the same origin and destination; the merchandise shipped was all of the same type, ladies' and children's wear; and each appellant in negotiating with the Stracuzzas contemplated a number of transactions.

Appellants admit that the Congress seems to have intended to permit aggregating shipments to meet the $5,000 requirement. But they urge that such a construction might make acts which were "innocent when done" criminal upon the occurrence of subsequent events, i. e. other acts of a similar nature. Such retrospective criminality is then likened to the doctrine of trespass *ab initio,* a doctrine repeatedly repudiated by the Supreme Court. McGuire v. United States, 1927, 273 U.S. 95, 98–99, 47 S.Ct. 259, 71 L.Ed. 556; Zap v. United States, 1946, 328 U.S. 624, 629, 66 S.Ct. 1277, 90

L.Ed. 1477; On Lee v. United States, 1952, 343 U.S. 747, 751–752, 72 S.Ct. 967, 96 L.Ed. 1270.

There is no merit whatever in this contention. Nor are we able to perceive how the transportation of stolen goods knowing them to have been stolen could be regarded as "innocent when done," regardless of the amount involved. The only reason for the $5,000 limitation is to avoid overtaxing the Department of Justice. There is no legitimate interest of appellants which the Congress sought to protect by this requirement. Hence it is perfectly rational to consider past acts in determining whether any appellant's conduct is important enough to warrant prosecution by the Department of Justice.

Finally, the Supreme Court's rejection of the doctrine of trespass *ab initio* is both irrelevant and cited out of context. In the cases cited supra the Court was faced with the problem of whether or not the Government could use evidence lawfully obtained after a lawful entry if, subsequent to the lawful entry, the agents who obtained the evidence committed unlawful acts unconnected with the obtaining of the evidence sought to be introduced. In each instance the Court held that the Constitution did not prevent the Government from using the evidence and that the subsequent unlawful acts did not affect the entry so as to "taint" the evidence. The policy considerations underlying the doctrine of trespass *ab initio*, i. e., to punish tortfeasors and to aid their victims, were found inapplicable to the situations there presented. In the case before us there is no "innocent" act being "tainted" by subsequent occurrences; there is no legitimate interest of appellants worthy of protection; and the Congress has a very definite stake in curbing such socially undesirable conduct. Hence we conclude there is no reason for construing the clear mandate of the Congress in any way other than that which was intended.

Appellants Karp and Marco claim that the $5,000 requirement of the statute was not met as they say there was no proof that any particular merchandise purchased by them was stolen. Indeed, they appear to assert that as Mario Stracuzza was the man who induced the truck drivers to steal the original packages and sell them to him, and as Mario did not testify, the whole case collapsed. We think it clear beyond peradventure of doubt on this record that, as testified by Tony Stracuzza, all the merchandise he dealt with as "distributor" was stolen merchandise. The collation of the various proofs of this fact vis-a-vis appellants Karp and Marco would be a work of supererogation.

### *Were Appellants Prejudiced by the Joint Trial*

■■ Were it not for the conspiracy count, it would have been clearly erroneous to try the appellants together under Rule 8(b), Fed.R.Crim.P., 18 U.S.C.[5] For there would be no common participation "in the same act or transaction constituting an offense" which is a requisite to joinder. See Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557; McElroy v. United States, 1896, 164 U.S. 76, 17 S.Ct. 31, 41 L.Ed. 355; Brooks v. United States, 5 Cir., 1947, 164 F.2d 142. However, the allegation of a conspiracy count meets the requirements of Rule 8(b) and hence at the outset the joinder was proper and within the discretion of the trial court. United States v. Ball, 1896, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300; United States v. Lebron, 2 Cir., 1955, 222 F.2d 531, certiorari denied, 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774; United States v. Cohen, 2 Cir., 1941, 124 F.2d 164, 165,

---

5. Rule 8(b) provides:

    (b) *Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

certiorari denied sub nom. United States v. Bernstein, 315 U.S. 811, 62 S.Ct. 796, 86 L.Ed. 1210. Moreover, it is not claimed, nor could it be with any show of reason, that the conspiracy count was alleged by the prosecution in bad faith.

Accordingly, as provided in Rule 14, Fed.R.Crim.P.,[6] we must determine on this appeal whether appellants, or any of them, were prejudiced by the joinder. Berger v. United States, 1935, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; United States v. Chieppa, 2 Cir., 1957, 241 F.2d 635, certiorari denied sub nom. Ivicola v. United States, 353 U.S. 973, 77 S.Ct. 1057, 1 L.Ed.2d 1136; Monroe v. United States, 1956, 98 U.S.App.D.C. 228, 234 F.2d 49, certiorari denied, 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76. The mere fact that the conspiracy count is dismissed at the close of the evidence by the trial judge, or that a verdict of acquittal on that count is returned by the jury, does not establish as matter of law that it was error to submit the substantive charges to the jury.

Appellants assert they were prejudiced by the joinder on two levels, general and specific. The Schaffers are content to claim that the mere idea of receiving individual treatment in a case that took over two weeks to try, involved hundreds of exhibits, numerous witnesses, and four separate defendants is so far-fetched that prejudice must be deemed to result as a matter of law. See Kotteakos v. United States, supra, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557.

This contention is belied by the record which reveals several precautionary measures taken to assure defendants of a fair trial and indicates no reason whatever why the jury should have been confused. First, each defendant was represented by a separate attorney except that Max and Norman Schaffer had one common counsel. Secondly, with virtually every offer of proof, testimony or exhibit, an instruction was requested and obtained that proof admitted with respect to one defendant was not to be considered with respect to any other defendant. Over fifty such requests and instructions were given. Third, the witnesses were called in orderly fashion so that each group of witnesses focused on a separate defendant. This practice was uniformly observed throughout the trial with but one minor exception. Finally, the Court's charge—admitted to be fair even by appellants' attorneys—carefully reviewed the evidence pro and con with respect to each defendant. And a clear direct admonition was given to keep the three distinct charges separate and not to consider evidence bearing on one defendant against another. Thus it is plain upon the face of the transcript of the testimony that throughout the trial Judge Murphy was scrupulously careful to protect the rights of each of the defendants and to make sure that none of them suffered prejudice from the joinder.

Moreover, there was nothing intrinsically complex about either the nature of the case, or of any testimony or exhibit, nor were the instructions of Judge Murphy to the jury in the slightest degree confusing or ambiguous. We have no problem of evidence admitted against one appellant which incidentally implicates another. There was only one witness common to all defendants, Tony Stracuzza, and he gave his testimony in orderly fashion describing his business and then his relationship and his transactions with each defendant in turn. Each defendant lived in a different part of the East, except the two Schaffers who operated their store together; and there is nothing in the record to indicate that any one of them knew of Stracuzza's dealings with the others.

In the face of cautionary instructions from the trial judge, far greater possi-

6. Rule 14 which provides:
    If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever relief justice requires.

bilities of confusion have been tolerated on the premise that the jury can and will do as it is told. See Delli Paoli v. United States, 1957, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278; Opper v. United States, 1954, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101; Blumenthal v. United States, 1947, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154; Berger v. United States, 1935, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; United States v. Bando, 2 Cir., 1957, 244 F.2d 833; United States v. Chieppa, supra, 2 Cir., 1957, 241 F.2d 635, certiorari denied, sub nom. Ivicola v. United States, 353 U.S. 973, 77 S.Ct. 1057, 1 L.Ed.2d 1136; United States v. Lebron, 2 Cir., 1955, 222 F.2d 531, certiorari denied, 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774; United States v. Leviton, 2 Cir., 1951, 193 F.2d 848, certiorari denied, 343 U.S. 946, 72 S.Ct. 860, 96 L.Ed. 1350; Nash v. United States, 2 Cir., 1932, 54 F.2d 1006, certiorari denied, 285 U.S. 556, 52 S.Ct. 457, 76 L.Ed. 945; Robinson v. United States, 1954, 93 U.S.App.D.C. 347, 210 F.2d 29; Dunaway v. United States, 1953, 92 U.S.App.D.C. 299, 205 F. 2d 23.

The case here is a far cry from the state of affairs disclosed in Kotteakos v. United States, supra, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. There 32 defendants were listed in the indictment and 19 were brought to trial. While one huge conspiracy was charged, there was testimony concerning eight separate conspiracies, and the trial court had not only not cautioned the jury about the possibility of many conspiracies and the need to consider the evidence as to each separately, but it instructed the jury that it might consider the overt acts of one conspiracy as proof of the guilt of other conspirators, whether in the same conspiracy or not. Here we have but four defendants whose individuality was carefully observed and protected by both the trial judge and the prosecutor, and a state of proof that we think demonstrates that the evidence adduced against each separate defendant could readily be considered as applicable to him alone.

Appellants Karp and Marco press the point further. They assert that some evidence was received which was admissible only for purposes of establishing the conspiracy and they suggest a few specific instances of evidence received against one defendant, subject to connection as to the others, which is claimed to have been prejudicial. None of these assertions of prejudice will bear analysis.

First, it is claimed that the testimony of Tony Stracuzza to the effect that each of the appellants had purchased stolen goods from Stracuzza's former employers, Berk and Eisenberg, during a six-month period prior to the date of the conspiracy charged in the indictment related only to establishing the conspiracy. However, it is well established that where criminal intent is an essential element of the crime charged, prior instances of a similar pattern of operation are relevant to establish scienter. See 2 Wigmore, Evidence, Section 325 (3d Ed. 1940); United States v. Brand, 2 Cir., 1935, 79 F.2d 605, certiorari denied, 1936, 296 U.S. 655, 56 S.Ct. 381, 80 L.Ed. 466. The proof as to these prior dealings showed the same use of manufacturers' invoices and the same substantial discounts from the manufacturers' wholesale prices as did the evidence concerning the transactions alleged in the indictment.

On the day of Stracuzza's arrest, the F. B. I. found in Stracuzza's office a number of original manufacturers' invoices and a sealed carton of merchandise addressed to Karp which contained such invoices. These exhibits were admitted into evidence, and appellants Karp and Marco assert only for the purpose of proving the conspiracy. However, it is apparent that such evidence was admissible substantively against all defendants since it tended to corroborate Stracuzza's allegedly "tainted" testimony concerning his practice of regularly including the manufacturers' invoices in his shipments.

Both Marco and Max Schaffer gave signed statements to the F. B. I. which

were quite damaging to their cases, Marco's because it admitted contact with Eisenberg, Schaffer's because it was falsely exculpatory. However, in each instance the Court instructed the jury to consider the exhibit only against the defendant against whom it was offered and later repeated this admonition when the conspiracy count fell through.

Similarly, what were claimed to be humorous remarks by Marco to the effect that the goods were stolen, testimony of an employee of Marco concerning the removal of labels from A. Schaffer merchandise and the insertion of new ones, an F. B. I. motion picture of Max Schaffer leaving Stracuzza's office on July 28, 1953, the day of Stracuzza's arrest, and testimony of Karp's dealing in stolen zoot suits were all accompanied by appropriate limiting instructions by the Court.

But when these items of proof are broken down, as they were in the summations to the jury, it is clear that each item is of such a character as to affect only the person involved. For example Max Schaffer alone was depicted in the motion picture showing him inspecting merchandise and documents, claimed by the prosecution to be manufacturers' invoices, in Stracuzza's show-room; and he is the very man who, shortly after the taking of the motion picture, told the F. B. I. men that he had never been in the place. So it was with reference to Karp's dealings with the stolen zoot suits, and his telephone conversation with Stracuzza about protection. In view of the repeated instructions on the point, no member of the jury could have supposed that these fragments of the prosecution's evidence affected any other defendant than the one involved in the particular matter testified to.

At best appellants' claims of prejudice come down to a complaint about the guilty "atmosphere" built up by associating each with others so obviously guilty, and the fact that a "tainted" witness was buttressed by the independent proof relating to all defendants, instead of that relating to one alone. Of course, the fact that each appellant makes these claims somewhat weakens their force. But in the absence of any bad faith on the part of the government in bringing the conspiracy count, the repeated interim instructions and the charge of the Court protecting each defendant's individuality have been traditionally considered as sufficient safeguards for those accused of crime. We conclude that none of the defendants suffered prejudice from the joinder.

There was more than ample proof to sustain a finding that each defendant knew the goods he was buying from Stracuzza were stolen, and that is all there is to the case. The attack on Stracuzza's credibility was a formidable one, amply justified by his record; but his credibility was a question solely for the jury to determine.

### The Propriety of the Prosecutor's Summation

During the course of their summation appellants sought to discredit the testimony of Tony Stracuzza by alluding to the Government's alleged breach of duty by its failure to call either Mario or Dorothy Stracuzza to corroborate his story. After pointing out that Mario's testimony would only be cumulative, that Dorothy's indictment was still pending, and that the defendants could have called them to the stand themselves had they wanted to, the prosecutor made the following comments.

"Now in making these comments as to the conduct of the prosecution, there was some criticism as to the extent that the Government failed in its obligations to its citizens to bring out all the facts. I say to you as an assistant United States Attorney, my job is not to convict people, but is to bring them here in court, give them a fair chance to meet the charges that the Government has presented against them.

"The motto on the building of the Department of Justice in Washington I think fairly indicates the attitude of the

Government, as far as citizens are concerned. It reads:

"The Government wins when justice is done its citizens in the court.'

"Now, of course, if you believe that the Government has in some way or other prevented you from getting the full truth of this entire case, that it in some way here concealed the true facts pertaining to any of these defendants, you have only one duty—you have to march right into that jury-room and acquit every one of these defendants."

Far from inserting the prosecutor's personal integrity into the case, these extracts demonstrate a commendable candor and sense of fair play by the Government in permitting the jury to draw inferences from the evidence or lack thereof. Thus calling attention to the duties of a prosecutor did not constitute any representation of the prosecutor's integrity. It was no more than a legitimate and proper answer to an argument advanced in the summation of appellants' counsel. Moreover, the trial judge later properly instructed the jury that no unfavorable inference could be drawn as to Stracuzza's testimony from the Government's failure to call other witnesses in view of the fact that these witnesses were equally available to the defense.

Affirmed.